**ZENITH RADIO CORPORATION,**
Plaintiff,

v.

**ADMIRAL CORPORATION,** Defendant.
Civ. A. No. 8613.

United States District Court
W. D. Oklahoma.
Sept. 15, 1960.

Embry, Crowe, Tolbert, Boxley & Johnson, Oklahoma City, Okl., Casper W. Ooms, Dugald S. McDougall, Francis M. Crotty, Chicago, Ill., for plaintiff.

Cochran, Dudley, Fowler, Rucks, Baker & Jopling, Oklahoma City, Okl., Howard W. Clement, James M. Wetzel and John L. Wiegreffe, of Byron, Hume, Groen & Clement, Chicago, Ill., for defendant.

RIZLEY, District Judge.

## I.   Findings of Fact
*The Action, The Parties, The Patents In Suit, And The Issues*

1.   This is a patent-infringement action brought by plaintiff Zenith Radio

Corporation against defendant Admiral Corporation, both of which are incorporated under the laws of Delaware. The jurisdiction of this Court arises under the patent laws of the United States.

2. Defendant has a regular and established place of business at Oklahoma City, Oklahoma, in this District, at which it has committed acts of infringement as hereinafter set forth in these findings. Defendant has been duly served with process herein. This Court has jurisdiction of the action and the parties, and the venue is properly laid in this District.

3. Plaintiff is, and since their respective dates of issuance has been, the owner of United States Letters Patent Nos. 2,817,025, 2,821,954, 2,821,955, 2,821,956, 2,814,671, and 2,915,583, and by its complaint herein charges defendant with infringement of each and all of said Letters Patent. Letters Patent Nos. 2,817,025, 2,821,954, 2,821,955, and 2,821,956 (hereinafter respectively referred to as the '025, '954, '955, and '956 patents) relate to various electrical and mechanical features of a remote-control system for television receivers, marketed by plaintiff under the trade name Space Command. United States Letters Patent No. 2,814,671 (hereinafter referred to as the '671 patent) relates to a noise-gated synchronizing-signal separator circuit for television receivers, marketed by plaintiff under the trade name Fringelock. United States Letters Patent No. 2,915,583 (hereinafter referred to as the '583 patent) relates to a noise-gated synchronizing-signal separator and automatic-gain-control circuit, constituting a modified and improved form of the basic Fringelock circuit.

4. Defendant is, and since its issuance has been, the owner of United States Letters Patent No. 2,498,333, and by its counterclaim herein charges plaintiff with infringement thereof. Said Letters Patent No. 2,498,333 (hereinafter referred to as the '333 patent) relates to a spindle construction employed in automatic record-changer mechanisms.

5. In its answer to the complaint, defendant denies infringement and asserts the affirmative defense that all of plaintiff's patents are invalid for want of invention. Other affirmative defenses set forth in the answer include a plea that plaintiff is prohibited from enforcing the '025, '954, '955, and '956 patents by reason of unclean hands and that plaintiff is estopped by laches from enforcing the '671 and '583 patents against the defendant.

6. Plaintiff's alleged infringement of defendant's '333 patent consists of selling record changers purchased by plaintiff from the V-M Corporation of Benton Harbor, Michigan, a large manufacturer of such products. Plaintiff acknowledges that the '333 patent is valid and that it has sold record-changer spindles incorporating its invention. Plaintiff's defenses to defendant's counterclaim are (1) that the defendant by virtue of its dealings with the V-M Corporation had at least granted to said corporation an implied license to manufacture and sell the record-changer spindle to the plaintiff and the general public, and (2) that defendant by reason of its conduct is estopped from now asserting the '333 patent against plaintiff.

7. The lawsuit and these findings may conveniently be separated into the following three parts:

(1) remote control, especially for television receivers, involving the '025, '954, '955, and '956 patents;

(2) noise-gated, synchronizing-signal separator circuit for television receiver involving the '671 and '583 patents; and

(3) spindle construction for automatic-record changing mechanisms involving the defendant's '333 patent.

### History Of The Space Command Development

8. "Remote control" of a television receiver refers to an arrangement by which a viewer, seated some distance from the set, can change channels, change the sound level, or turn the set on and off without actually rising and walking over to the set. Remote-control devices are not restricted in their usefulness to television; they are a convenience in the

**44**

operation of radio receivers, and the radio industry tried for years to develop a remote control system for radio sets unsuccessfully. With television, remote control has a more important status than with radio because a television set must be watched at a distance greater than arm's length. A remote-control device, whatever its field of application, consists basically of a transmitting device, accessible to the operator by which he can transmit a "command" for operation of the device to be controlled, and an apparatus associated with the controlled object for receiving the operator's "command" and carrying it out.

9. In past years many different systems for remotely controlling radio sets, television receivers, and other electrical devices have been suggested, with a wide variety of apparatus used for generating, transmitting, and executing "commands". Perhaps the simplest scheme for remote control involves running a wire cable between a control box and the television set or other device to be remotely controlled. In systems of this kind, the operator gives his "commands" by pressing buttons or turning knobs on the control box, which in turn actuate electrical switches; the "commands" are transmitted in the form of electric currents through the wire cable. Numerous companies, including both parties to this action, have manufactured remote-control systems of this kind for operation of television receivers and radio sets, but all of such systems failed commercially. The failure of such systems was due, at least in considerable degree, to the fact that a wire cable running across a floor is dangerous, unsightly, and easily damaged.

10. Another type of remote-control system for radio and television receivers, often suggested in the literature and tried out commercially by the Philco Company about 1938, employed radio waves for communicating commands between the control box and the receiver. In this type of system, the control box was a miniature radio transmitter. This type of remote-control system has never

been commercially successful. Its failure was due, first, to the fact that the control box of such a system necessarily contains delicate electronic parts and batteries, rendering it fragile and requiring periodic replacement of parts, and, second, to the fact that radio waves travel freely through walls, making such systems impractical for use in apartment buildings.

11. Still another remote-control system, commercialized some years ago by plaintiff, used light flashes for communicating between the operating position and the television cabinet, electric-eye devices being built into the television cabinet to receive the flashed "commands". This system also had little public acceptance. The manual control box—actually a special type of flash light—required periodic replacement of batteries, the device had to be carefully "aimed" at the particular electric eye to be actuated for carrying out any given command, and the system was subject to accidental operation by lights other than those from the control instrument.

12. None of the aforedescribed remote-control systems, nor any other prior art systems for remotely controlling home radio or television receivers, achieved any sustained success. Despite years of effort by qualified experts working with full knowledge of the need and doing their best to satisfy that need, no remote-control system for radio or television ever succeeded commercially until Zenith's Space Command system appeared.

13. Zenith's Space Command system is a remote-control system in which "ultrasonic" sound waves—i. e., sounds too high in pitch to be heard by the human ear—are used for communicating "commands" across the space between the operator's position and the television receiver or other instrument to be controlled.

14. In Space Command, the transmitter or control box is a small, handheld instrument provided with push buttons, labeled to identify the various receiver functions that each button con-

trols. It is entirely mechanical, containing no tubes, no electrical parts, and no batteries. The transmitter is rugged and capable of withstanding rough handling and occasional dropping. It can be operated equally well in any position, does not have to be "aimed" at the television set, and requires no manual skill. In operating the transmitter, the user simply presses the button that governs the desired function, such as television tuning, and thereby generates an ultrasonic impulse of a particular frequency assigned to the selected function.

15. The ultrasonic impulses represent "commands" and travel through the air to the television set, where they are picked up by a microphone, and are converted to corresponding electric impulses. The microphone is a part of the receiver portion of the Space Command system, the remainder of the receiver comprising electrical circuits which amplify each "command" impulse derived from the microphone, sense its pitch or frequency, and operate a particular relay connected to perform the tuning or operating functions called for by the "command" impulse.

16. Space Command is a truly integrated system in which each component cooperates uniquely with the other components to provide dependable, trouble-free operation. The mechanical transmitter is tailored to produce sound impulses of a predetermined duration and definite frequency according to the particular button pressed by the user. The receiver circuit is correspondingly tailored to respond only to received sound impulses having the appropriate duration and having one or another of the definite frequencies used in the system. Circuits are provided in the receiver which enable it to distinguish effectively between the ultrasonic impulses generated by the transmitter and random ultrasonic noises, such as are caused by rattling of keys or tinkling of glasses, that are frequently present in a home environment and which, in the absence of such protective circuits, would produce spurious operation of the control relays.

The mechanical and electrical components of the Space Command system are so designed and constructed that the system will operate equally well whether the transmitter be operated directly in front of the receiver or across a large room from it, at a distance of thirty or forty feet. Because ultrasonic waves do not pass through walls, the Space Command system is entirely free from interference between television sets in adjacent apartments or different rooms of a house.

17. The Space Command system was conceived in the latter part of 1955 by Dr. Robert Adler, Zenith's Associate Director of Research. At that time, Zenith already had considerable experience with remote-control systems of other kinds. It had manufactured television sets with other kinds of remote-control systems. Its management understood their inadequacies and non-acceptance by the public. It urged its engineering and research people, including Dr. Adler, to give thought to the problem of a better remote-control system. Dr. Adler, after reviewing a number of possible approaches to the problem, suggested, as a promising avenue of research, a multiple-channel remote-control system in which ultrasonic sound impulses of different frequencies (i. e., pitches) would be used to carry "commands" from the operator's position to the television receiver, each frequency being used in connection with a particular control function. Dr. Adler realized that, with this approach, a wholly mechanical transmitter might be possible.

18. An experimental project was undertaken by Dr. Adler's research group, directed to trying out the basic aspects of the system and determining its practicability. The early phases of this project included both experimental work by Dr. Adler on the development of a suitable receiver circuit and several projects, under Dr. Adler's direction, directed to determining whether ultrasonic sound impulses could, as a practical matter, be successfully used in homes as a remote-control communication medium.

19. Dr. Adler was convinced that any successful system would necessarily include a push-botton transmitter that would operate mechanically, rather than by use of electrical circuits and batteries. He considered various possible means of producing ultrasonic sound impulses mechanically and decided to try cylindrical metal rods struck on their ends by hammer blows to generate vibrations in the so-called "longitudinal mode". In this mode of vibration, a rod vibrates longitudinally, alternately shrinking and expanding outwardly from its center, along the longitudinal axis. This type of sound generator not only appeared promising from the economy standpoint but had the advantage of being large enough in size to radiate powerful sound impulses into the air. (Other known types of vibrators, such as bells, gongs and other forms of transverse mode vibrators, if designed for operation in the ultrasonic frequency range, would be so small in size as to radiate poorly and, further, they present serious manufacturing problems.)

20. Considerable experimental work was done on various types of rod materials, and a particular type of commercially available aluminum alloy was chosen as the most satisfactory material from the standpoints of performance, availability, and cost. A particular advantage of aluminum rods was that they proved to have excellent energy-storage properties, vibrating for a long time after being struck. (This property of a resonator is referred to in engineering parlance as the "Q" i. e., "quality factor" and is measured numerically, the energy-storage properties of a given material being directly proportional to its "Q" number.)

21. During the early work on the Space Command project, the experimental resonator rods, held at the center between thumb and forefinger or by means of surgical tweezers, were manually struck by small hammers. As soon as it was definitely determined that ultrasonic signals of suitable intensity, frequency, and duration for remote-control purposes could be generated in this way, and after the experiments had established that such impulses would travel far enough through air, work was started on the development of a practical hand-held, push-botton transmitter. This project became the direct responsibility of an engineering group under the direction of Clarence W. Wandrey, Zenith's chief mechanical engineer. Dr. Adler, however, kept in close touch with the work and maintained an active advisory control over it.

22. Design of a suitable hand transmitter for the new system required solution of many problems. To provide the sound intensity necessary for remote control at distances of thirty to forty feet, the resonator rods had to be struck hard, giving off a pure tone of a definite frequency. At the same time, the striker mechanism had to be easily operable without excessive finger pressure, in order that the transmitter could be readily operated by a woman or child. Moreover, Zenith's engineers learned that the transmitter must somehow be constructed to insure that the finger-operated hammer would strike the resonator rod only once for each button movement. Multiple hammer impacts, it was found, weakened the generated sound and caused it to die out quickly. Another major problem that had to be overcome was mounting of the resonator rods in the transmitter box. They necessarily had to be mounted in a way that would hold them securely against dislodgment under the impact of hammer blows; at the same time the mounting structure must not reduce the "Q" of the rods appreciably. Another problem involved finding a suitable, economical means of ending the rod vibration when the push button was released. Otherwise, it was learned, the emitted sound impulse might last so long as to produce multiple operation of the remote-control relays.

23. One by one, these problems were solved; the mechanical inventions by which they were solved are described in and covered by the '954, '955, and '956 patents in suit. The hand-held, finger-

operated ultrasonic transmitter which embodied these inventions was a truly new product. So far as appears from the record, nothing structurally or functionally like it had ever been built before.

24. Another technical problem studied and solved by Dr. Adler and his associates was the selection of pitches (frequencies) of ultrasonic signals to be used in the remote-control system. After experimenting with several different ranges of pitch, Dr. Adler selected a range of frequencies in the neighborhood of 40,000 cycles (40 kilocycles) as most satisfactory from the standpoints of resonator size, weight, effective distance range, and freedom from interference with the electrical circuits in the television receiver itself.

25. While the mechanical transmitter was being developed, Dr. Alder carried on a concurrent research program with respect to the receiver portion of the remote-control system. This part of the work carried with it its own special problems. It was necessary to provide a receiver which would amplify enormously the weak electrical signals derived from the microphone, to permit successful remote control at distances of thirty to forty feet; at the same time, the receiver must possess electrical stability. The requirements of the system called for a circuit that would accurately and effectively distinguish between ultrasonic signals of one frequency and another, in order that the ultrasonic "commands" be accurately interpreted and carried out, without confusing a command for controlling one function with a command intended to perform another function. Reduction in number of components and circuit complexity was itself a major problem, since the cost of the system had to be held within reasonable bounds if it were to be salable as a consumer product.

26. One of the most critical problems faced by Dr. Alder in the development of the receiver circuit was undoubtedly that of insuring dependable relay operation in response to the ultrasonic commands from the transmitter, as received under practical conditions, while at the same time avoiding relay operation in response to rattling keys and other random ultrasonic noises picked up by the microphone. This problem was made especially difficult by the circumstances under which Dr. Adler intended his remote-control system to work. Rather than having strong command signals from a power-driven sound source, as had been suggested in previous remote-control systems, Dr. Adler's system had to operate on the relatively weak ultrasonic signals generated by a finger-actuated transmitter. Hence, ultrasonic noise at the receiver microphone was often stronger than the desired signals, especially when the signals came from a considerable distance. Further, the signals from the hand transmitter were not uniform in intensity throughout their duration, but, like other sounds produced by percussion, decayed or "died out" with passage of time. Ultimately, after extensive experimenting, Dr. Adler developed a receiver circuit in which a rather complex combination of elements cooperated to achieve the result he was seeking. This new receiver circuit successfully responded to ultrasonic signals of the desired frequencies and duration, even though they might be very weak and momentarily interrupted by noise or other cause. At the same time, the receiver exhibited almost complete immunity to ultrasonic noises and other forms of interference. This receiver circuit, invented by Dr. Adler, became the subject matter of the '025 patent in suit.

27. Zenith's research program which resulted in the Space Command remote-control system took place between October of 1955 and February or March of 1956. The new remote-control system represents the distilled and refined product of endless hours of thought, experiment and effort. It was ready for commercial production shortly before the middle of 1956, and was first introduced publicly, under the trade name "Space Command", in the summer of that year.

*The Space Command Patents And The Defenses Asserted Against Them*

28. The invention of the '025 receiver patent, in its simplest or basic form, in-

volves a circuit combination which, in conjunction with a microphone and amplifier, includes a limiter, a frequency discriminator, an integrator circuit, and a biased relay control tube, also referred to as an amplitude discriminator. The elements of this basic combination are so adjusted as to provide relay operation only in response to signals of predetermined frequency and predetermined minimum duration and duty cycle. By this combination of circuit elements, which work by cooperative action, Dr. Adler achieved a new result—namely, a receiver circuit which would reject noise, while at the same time responding to signals of the desired "command" frequency, even though interrupted, if they were present in the discriminator output at the amplitude-limited level for a predetermined percentage of the normal duration of a command impulse. The recommended adjustment for duty cycle in the '025 patent is to set the relay actuating voltage at a level between 50% and 65% of the maximum limited output voltage of the discriminator. The new result of the Adler circuit invention was rejection of noise concurrently with successful reception of command signals despite signal interruptions caused by noise interference, echoes, or other factors.

29. In addition to the basic circuits described in the foregoing finding, the Adler receiver invention included other features which were new in the over-all combination. One of these was the use, in a multi-function remote-control system, of a dual-frequency discriminator having two output connections respectively fed to two distinct relay control tubes, controlling different and independent functions. By this novel circuit feature, Dr. Adler was able to use a single frequency discriminator for two control channels, thereby achieving considerable reduction in the total number of parts required for a multi-channel receiver. This feature of the Adler '025 invention was optional, being called for in some claims of the patent but not required in all claims.

30. In attempting to show invalidity of the '025 patent in suit for want of in-

vention, Admiral relied primarily on the previous work of one Boley Andrews, as disclosed in Andrews patent No. 2,739,273 and various other publications. Andrews himself appeared as a witness for Admiral, and both he and Admiral's other expert witness on this phase of the case agreed that the disclosure of the Andrews patent No. 2,739,273 could be regarded as fairly representative of the Andrews prior art. In addition to the Andrews work, Admiral placed some reliance on Alexandersson patent No. 2,320,996, with respect to the dual-frequency, double-output feature of the '025 patent. Various other prior-art references were cited by Admiral in respect to the '025 patent, but only as showing sonic remote control in the broad sense. Hence consideration in those findings need be given only to the Andrews and Alexandersson references.

31. The Andrews prior art relates to an ultrasonic remote control for operation of garage doors, developed by Boley Andrews about 1946 or 1947. In this remote-control system, Andrews used as his transmitter an ultrasonic whistle driven by power from an automobile engine. This is conceded by Admiral to be irrelevant to the '954, '955, and '956 Space Command transmitter patents. Only with reference to the '025 receiver patent does Admiral rely on the Andrews prior art.

32. The remote-control receiver developed and used by Boley Andrews in his garage-door control system did resemble the Adler receiver described and claimed in the '025 patent in a number of respects. It employed a microphone for picking up ultrasonic waves and converting them to electric-wave impulses, an amplifier, a limiter, a discriminator, and a relay control system for operating a door-actuating relay in response to ultrasonic signals received by the microphone. The evidence establishes, however, that the Adler circuit differed sharply from the Andrews circuit in several ways.

33. A most important difference has to do with the so-called "duty cycle" function of the Adler circuit, by means of which the Adler circuit is rendered immune to spurious actuation by noise

while having at the same time the ability to respond to command impulses of normal duration which are momentarily interrupted by noise or momentarily cancelled out by echo reflections. Mr. Andrews himself acknowledged that his circuit does not operate like the Adler circuit in respect to the duty-cycle function, and is not capable of achieving the results of the Adler circuit. Andrews admitted that his circuit would not respond to any signal that was interrupted for even so much as a few thousandths of a second during its minimum duration, relay operation in the Andrews system requiring a continuous, uninterrupted signal for the entirety of a prescribed period, recommended in the Andrews patent to be three seconds.

34. Another significant difference between the Adler circuit and the Andrews prior art relates to Adler's dual-frequency discriminator from which two output signals are separately fed to two different relay control tubes, a single discriminator being thereby employed for two different and independent remote-control functions. None of the Andrews prior art discloses any such arrangement. Andrews did use two different frequencies in his garage-door control systems, to prevent neighbors from inadvertently opening one another's garage doors. He did not, however, use two frequencies in any one garage-door opener, the receivers for the so-called "red" and "blue" frequencies having been separately manufactured and tuned. In the one piece of Andrews equipment which used two frequencies—an ultrasonic flaw detector and not a remote-control device—Andrews employed a receiver having two separate discriminators, one for each frequency, rather than utilizing a single discriminator for two different remote-control frequencies as Adler did. The Andrews prior art also lacked a further Adler optional feature of a frequency-multiplying circuit in the receiver that would produce amplitude-limited signals at a multiple, greater than one, of the ultrasonic signals.

35. The only item of prior art relied on by Admiral as a forerunner of the Adler dual-frequency, double-output discriminator circuit was the Alexandersson patent No. 2,320,996, but this patent clearly lacks the Adler inventive concept. Alexandersson described a system for remotely controlling a rotating object by means of a continuous electrical signal, control being accomplished by varying the frequency continuously within a predetermined range. In Alexandersson's receiver, a frequency discriminator circuit having two output connections was used. These connections, however, both fed the same amplifier and were not used, as Adler uses them, to carry separate control signals to separate load devices, each independently operable without the other. In the Alexandersson system, the signals from the two discriminator output terminals always operated in conjunction, like the opposite ends of a teeter-totter, both cooperating in the achievement of a single control function. The Alexandersson frequency discriminator is not the same as that of Adler, and there is no suggestion, in the Alexandersson patent or in any other prior art, which would lead a skilled reader to modify the Alexandersson discriminator in the manner necessary to make it work like the Adler invention.

36. The invention of the '025 Adler patent is novel in structure and does achieve a new and useful result in an unobvious way, not taught or suggested by any prior art. It is therefore a patentable invention, and Admiral has failed to sustain its burden of proof with respect to its plea that the '025 patent is invalid for want of invention.

37. The '954 patent, of which Dr. Adler is the inventor, is directed to a mechanism by which the ultrasonic vibrations from the transmitter resonator rods are automatically damped—i. e., suppressed—when the push button is released. The utility of this invention consisted in controlling the duration of the ultrasonic command impulses so that the remote-control relays in the television receiver would operate only once for each

command. The mechanism described in and covered by the '954 patent embodied the novel principle of damping the longitudinal-mode resonator by applying a movable damping element to the *side* of the resonator rod when the push button is released, the mechanism also including means for moving the damping element out of contact with the rod during the part of the push-button movement that produces the hammer impact on the rod. This method of damping a longitudinal-mode resonator was advantageous in that it permitted the use of an inexpensive metal damping element, such as a piece of spring wire, to damp out the vibrations by frictional contact with the side of the rod. This is in contrast to the previously known method of damping longitudinal-mode vibrators by applying a damping member to the end face of the rod. End damping will work successfully, but it requires the use of a soft damping material. The vibrations on the end face will throw a metallic damping element away from contact with the rod, producing "chatter" —i. e., rattling—and ineffective damping action.

38. In attempting to show invalidity of the '954 patent for want of invention, Admiral relied, as prior art, on Morris patent No. 1,490,476, Gardiner patent No. 2,167,600, Rest patent No. 2,512,777, and White patent No. 2,728,902. Admittedly, none of these patents anticipates the subject matter defined in the claims of the Adler '954 patent in suit. The issue to be resolved, therefore, is whether, in view of these prior-art patents, the '954 invention would have been obvious at the time it was made to a person of ordinary skill in the art.

39. The Morris patent No. 1,490,476 relates to an electrically operated door chime. The chime shown in Morris is a hollow metal tube, caused to ring by being struck on its side by an electrically operated hammer. The damper described by Morris is a cushioned element which, as the hammer moves away, is brought into contact with the end of the chime tube. The Morris chime is not a longitudinal-mode vibrator, the damper does not en-

gage the side of the vibrator, and the chime is not push-button actuated. The Morris patent fails to disclose any of the specifically defined features of the Adler '954 invention.

40. The Gardiner patent No. 2,167,600 relates to a musical instrument, and its disclosure is similar to that of the Morris patent, so far as the features here under consideration are concerned. Gardiner, like Morris, does not describe a longitudinal-mode vibrator, but rather rods or bars which are caused to vibrate transversely by being struck on their sides. Damping in the Gardiner device is accomplished by an electrically actuated end damper, consisting of a disc covered with a pad of felt or rubber. The timing of the hammer-striking and damping actions is controlled in the Gardiner device by an electric circuit. Thus Gardiner fails to disclose any of the features of the invention specifically defined in the claims of the '954 patent, and, if anything, is even more remote from the invention of that patent than the Morris reference already mentioned.

41. The Rest patent No. 2,512,777 is another reference dealing with a musical instrument. It does not deal with longitudinal-mode vibrators, and it has no separate damping element. In the Rest device, tubular transverse vibrators are made to ring by being struck on the sides with hammers, and the vibrations are damped simply by permitting the hammers to return into contact with the vibrators following the initial blow. The Rest device does not have any of the claimed features of the '954 invention.

42. The White patent No. 2,728,902, which was considered by the Patent Office during the prosecution of the '954 patent, does disclose an ultrasonic generator employing a longitudinal-mode cylindrical vibrator. In the White device, the vibrator is excited by being struck on its end by a motor-driven hammer. White damps the rod vibrations, however, by means of an end damper, consisting of a doughnut-shaped ring of cork, felt, or rubber, mechanically arranged to move into contact with the end of the rod shortly after the rod is struck by the

hammer. The hammer strikes the rod by passing through the hole in the doughnut-shaped damper. In another form of the White device, he discloses a so-called "damper" consisting of a stationary vibration-absorptive ring permanently clamped onto the rod some distance from its end. This is not a "damper" in the sense in which that term is used in the '954 patent—i. e., a device which is out of contact with the vibrator when it is struck and which later touches the vibrator to make it stop vibrating. This last-mentioned White damping ring is a device which cuts down the vibrations of the rod at all times, even at the instant of hammer impact. It operates as a constant load or "drag" on the vibrating rod. The first-mentioned White damper is a true damper in the sense of the Adler invention, but it does not operate by bearing against the side of the rod, as in Adler, but on the contrary presses against the end face of the rod, damping the vibrations on the same part of the rod where the hammer blows take place.

43. Admiral contends that the Adler '954 invention would, in view of the prior art, have been obvious at the time it was made to a person of ordinary skill. This contention is rejected. None of the prior art discloses the Adler concept of damping a longitudinal-mode resonator by contact with its side. That the Adler invention was not obvious is strongly indicated by the fact that White, working with a longitudinal-mode vibrator at a date years after issuance of the other cited prior-art patents, did not think of using a side damper such as Adler taught but, on the contrary, found it necessary to employ a mechanically elaborate end-damping arrangement with a doughnut-shaped, soft damping ring and a hammer arranged to pass through the central opening of the damper when striking the rod. The advantages of the Adler construction are clear; it permits use of a metallic damping element as opposed to the more expensive felt or rubber damper, and it avoids all problems of mechanical interference between the hammer and the damper. Had this concept been obvious, it seems most likely that White

would have adopted it rather than going to the cumbersome and complicated system which he did use.

44. The invention of the '954 patent is novel in structure, accomplishes a new and useful result, and would not have been obvious at the time it was made to a person of ordinary skill in the art. It is, therefore, a patentable invention.

45. The '955 patent, of which Zenith's engineers Robert C. Ehlers and Clarence W. Wandrey were joint inventors, covers the basic Space Command transmitter structure, consisting of an ultrasonic resonator rod mounted at its nodal plane, a hammer for striking the rod, a spring supporting the hammer near one end of the rod, and associated mechanism for causing the hammer to deliver a powerful single blow to the end of the rod in response to a manual push-button actuation. The product covered by this patent is a novel article of manufacture, and its development as with the other Space Command patents, required simultaneous solution of several difficult problems. Successful remote control at considerable distances from the television set required that the transmitter of the Space Command system deliver powerful hammer blows to the resonator rods to produce sound impulses of the necessary high intensity. These blows, however, had to be produced by a relatively light finger movement to permit operation of the instrument by women and children. The mechanism, moreover, had to be so constructed that a single finger movement would produce only one hammer blow on the rod. At an early stage of their experimental work, Zenith's engineers had discovered that multiple hammer impacts would damp out and weaken the sound impulse produced by the first blow, rather than reinforce it. Along with these technical demands, the transmitter mechanism had also to satisfy practical requirements—it had to be mechanically rugged, capable of operation in any position, and reasonably inexpensive in construction.

46. The structural combination described in and covered by the '955 patent satisfied all the requirements noted in the

foregoing finding. The patent teaches that the weight of the hammer, the resiliency of its spring support, and the spacing between the hammer and the rod should be so proportioned that the hammer is able, when tripped, to strike the rod only once for each push-button movement.

47. In attempting to show invalidity of the '955 patent for want of invention, Admiral relied, as prior art, on Treanor patent No. 1,357,915 and Connell patent No. 186,416. These patents, whether treated singly or taken together, do not anticipate the subject matter defined in the claims of the '955 patent. Hence the issue to be resolved is whether the '955 invention, as a whole, would have been obvious at the time it was made to a person of ordinary skill in the art, in view of the Treanor and Connell patents.

48. The Treanor patent No. 1,357,915 relates to a signal gong, intended for use in mines, consisting of a bell with mechanism mounted inside for ringing it when a cord or chain is pulled. The structure disclosed by the Treanor patent is not responsive to the claims of the '955 patent in suit, and it differs from the '955 invention in several respects. Admittedly, the bell of the Treanor patent is a transverse-mode and not a longitudinal-mode vibrator. Treanor's bell was not a generator of any specific ultrasonic frequency; on the contrary, it was a resonator which, upon being struck, would give off a great variety of different tones and pitches. Further, Treanor's mechanical structure is quite different from that described and claimed in the '955 patent. For one thing, the Treanor device has no separate hammer; it used as its impact member the same metal bar that serves, according to Admiral's expert witness, as an "exciter tensioning means". In the '955 patent, on the other hand, the hammer or "exciter" is carried on one end of a spring which is distinct from the "exciter tensioning means". This spring, in the structure of the '955 patent, plays an important part in the single-impact operation of the device, and it admittedly has no counterpart in the Treanor device.

Finally, the Treanor patent discloses no apparatus for restricting to a single blow the impact of the "exciter tensioning means" against the inner surface of the bell when the chain has been pulled, nor does Treanor teach the desirability of such a construction.

49. The Connell patent No. 186,416 was granted in 1877 and is thus 83 years old. It discloses a manually operated door bell, in which manual pressure on a push-button causes the bell to ring. The mechanism of this old Connell door bell patent is quite different from that described and claimed in the '955 patent and it lacks entirely the distinctive novel features of the '955 invention. Specifically, the Connell door bell does not make use of a longitudinal-mode vibrator, it does not generate a specific ultrasonic frequency, and contains neither apparatus for insuring a single impact between the clapper and the bell nor any teaching that such single impact would be desirable.

50. The White patent No. 2,728,902, which was cited by the Patent Office in the prosecution of the '955 patent, is a closer reference, insofar as the '955 invention is concerned, than either the Treanor or Connell patents.

51. While admitting that none of the prior art cited against the '955 patent anticipates its claimed subject matter, Admiral contends that the '955 invention as a whole would, in view of such prior art, have been obvious at the time it was made to a person of ordinary skill. This contention must be rejected. None of the prior art discloses the basic concepts of the '955 invention, nor does any prior art disclose a product similar in structure and purpose to the ultrasonic transmitter of the '955 patent. The record shows that many skilled persons had worked to provide a successful remote-control device for radio or television, during the three decades immediately preceding the development of Zenith's Space Command. Some of those systems operated on sonic principles. Yet no one, in all the history of that work, ever suggested or taught how to make a product such as the Space

Command transmitter. In the prior art electrically operated tuning forks, power-operated whistles, breath-operated whistles, and the human operator himself were suggested as sources of sound for operating sonic remote-control devices. There is no suggestion in that prior art, however, of a hand-held, finger-operated ultrasonic generator. Since Zenith introduced such a product, hundreds of thousands of them have been made and sold. In view of its clear advantages over other forms of sound generators for remote-control systems, as well as its structural simplicity and low cost, the Space Command transmitter would almost certainly have been suggested long ago if its concept had been obvious as Admiral contends. Certainly many persons skilled in the art had been unsuccessfully seeking such a device over a period of years.

52. The invention of the '955 patent is novel in structure, accomplishes a new and useful result, and would not have been obvious at the time it was made to a person of ordinary skill in the art. It is, therefore, a patentable invention.

53. The '956 patent, of which Zenith's engineer Ole E. Wold (now deceased) was the inventor, relates to the means used in the Space Command transmitters for mounting the resonator rods within the transmitter case. The mounting device of the '956 patent represented solution of a difficult problem. A longitudinal vibrator, as exemplified by the resonator rods of the Space Command transmitter, vibrates by shrinking and expanding outwardly from its middle portion toward its ends. Hence, the vibration is greatest at the ends of the rod and, theoretically, is almost zero at the central plane of the rod; that is, the plane which crosses the rod at right angles, exactly midway between its ends. This region of minimum vibration is called the "nodal plane", and it is the best region in which to mount the rod. The most important requirement for a successful mounting is that it must make a minimum of contact with the rod, so as to interfere as little as possible with the vibration, maintaining the "Q" of the rod as high as possible.

A good mounting for an application such as the Space Command transmitter also must be mechanically rugged and capable of holding the rod securely in place, even under the force of the powerful hammer blows by which the rod is made to generate ultrasonic impulses. Further, because cutting away material from the center of a rod changes its pitch or frequency, it was desirable that the rod mounting should require a minimum cutting away of rod material—the less the better, in the interest of facilitating mass production of uniform-frequency rods.

54. The rod mounting of the '956 patent, by which the foregoing problems were solved, consisted in anchoring a pair of spring wires on a rigid metal bracket, spaced apart by a distance slightly less than the rod diameter, cutting oppositely disposed narrow grooves in the resonator rod along its nodal plane, and sliding the rod between the spring wires, which snap into the grooves and lock the rod in position. Because the spacing between the spring-wire supports on the bracket is less than the diametric spacing between the grooves, the wires engage the grooved rod only at a limited number of points, the springs "bowing" outward from their bracket anchors and gripping the rod tightly between them. In the preferred form of the invention, the grooves were made in the form of flat-bottomed slots diametrically opposed in the nodal plane of the rod, so that the bowed spring wires made contact with the rod only at four separated points, at the respective ends of each slot. In this preferred construction, the pressure at each of the four spaced contact points is enormously high, and the rod is therefore held securely by the spring wires against both longitudinal and lateral dislodgment. The contact area between the bowed springs and the rod surface in the '956 invention is so small that the mounting structure does not have any appreciable effect on the vibration of the rod and does not significantly reduce its "Q".

55. In attempting to show invalidity of the '956 patent for want of invention, Admiral relied, as prior art, on the

White patent No. 2,728,902, the Rowe patent No. 2,516,725, the Lutzens patent No. 2,304,835, and a publication in Physics magazine. Admiral acknowledges that none of these references anticipates the subject matter defined in the claims of '956 patent in suit. Here again, therefore, the issue to be resolved is whether, in view of prior art, the '956 invention, as a whole, would have been obvious at the time it was made to a person of ordinary skill in the art.

56. The Rowe patent discloses a musical instrument containing metal rods suspended by strings looped around the rods. The rods disclosed in Rowe were not longitudinal-mode vibrators and Rowe does not disclose or suggest spring wires for rod mounting. The Rowe patent is not a pertinent reference with respect to the '956 invention.

57. The White patent No. 2,728,902, which was cited by the Patent Office in the prosecution of the '956 patent, discloses a mounting for a longitudinal-mode vibrator in which the rod is provided with a circumferential groove in its nodal plane and is held by a pair of clamping ribs curved to fit tightly in the groove. This general type of rod mounting was among those tried out experimentally by Zenith's research workers and discarded because it cut down the "Q" of the rods too much. Admiral also tried such a mounting and discarded it for the same reason, adopting instead the spring wire mounting of the '956 patent. There is admittedly no teaching or suggestion in the White patent that spring mounting means could be used for supporting the longitudinal-mode vibrator.

58. The Physics magazine article, relied upon by Admiral as prior art against the '956 patent, describes a series of laboratory experiments made in measuring the physical properties of various materials, including metals of several kinds, hard rubber and glass. In these experiments the authors made their measurements on cylindrical rods fashioned of the various materials to be tested, the rods being set into vibration by electro-magnetic means rather than being struck with a hammer. As a means of supporting the experimental rods, the authors described a sling arrangement in which the rods were supported by two pieces of very fine piano wire, one piece being wrapped approximately half way around the rod and the other piece being wrapped around the other portion of the rod diameter. Both wires were anchored to fixed pins at the corners of a square frame. Physical specimens of the wire sling mounting of the Physics article were demonstrated to the Court by both parties. These demonstrations have shown that the rod mounting described in the Physics article was an extremely sensitive, delicate structure, capable of holding a rod in a precarious balance for a laboratory experiment but wholly unsuited for supporting resonator rods in a hand-held ultrasonic transmitter in which the rods were to be excited by hammer blows. The slightest tilting of the Physics mount resulted in swinging and tilting of the rod. There is no teaching or suggestion in the Physics article concerning the use of grooves in connection with the wire sling mounting therein described, and there is also no suggestion or teaching of disposing the rods within a spring wire support that makes contact with the rod only at a limited number of spaced points. On the contrary, the wire sling mounting of the Physics article touches the rod continually throughout the major part of its circumference. The courtroom demonstrations showed that the sling mounting of the Physics article was still very unstable even when used in conjunction with a grooved rod. The Physics article does not teach any of the distinctive and novel features of the '956 invention.

59. The Lutzens patent No. 2,304,835 deals with various arrangements for mounting piezo-electric crystals with wires which, in addition to supporting the crystal, also act as electric conductors for carrying current to the plated conductive surfaces of the crystals. The teachings of this patent are wholly irrelevant to the '956 invention. The wires

disclosed in the Lutzens patent are not spring wires as required by the '956 invention, but are simply ordinary wire conductors. The crystals described by Lutzens were, for the most part, transverse-mode vibrators, and the wires of the Lutzens circuit were in direct contact with the plated surfaces of the crystal throughout their length. Indeed, Lutzens suggested that these wires should even be cemented to the plated crystal surfaces. Lutzens did disclose one form of crystal which vibrated in a manner analogous to longitudinal-mode vibration. For this crystal, however, he taught a mounting which made a surface contact with the vibrating faces of the crystal for substantial distances adjacent the edges of the crystal faces. Considered as a whole, the Lutzens patent clearly deals with quite a different problem from that involved in the '956 invention and none of the mounting means suggested in Lutzens is analogous in structure, function or result to the '956 invention.

60. The Court rejects Admiral's contention that the '956 invention, as a whole, would have been obvious at the time it was made to a person of ordinary skill, in view of the prior art. None of the prior art discloses the combination of grooved rod and spring-wire support described and claimed in the '956 patent. The prior art lacks completely any teaching of the basic concept of the '956 patent, by which a grooved rod is used in conjunction with spring wires spaced apart slightly less than the rod diameter, so that they bow when the rod is forced between them and hence contact the rod at only a limited number of spaced points. Since both the structure and the concept of the '956 invention is absent from the prior art, the invention, as a whole, was not obvious. This is confirmed by the fact that Admiral, after unsuccessfully trying a number of other mountings, found it necessary to copy Zenith's rod mounting.

61. The invention of the '956 patent is novel in structure and concept, accomplishes a new and useful result, and would not have been obvious at the time it was made to a person of ordinary skill in the art. It is, therefore, a patentable invention.

62. The Court finds from all of the evidence in this case that Zenith's remote-control patents, the '025, '954, '955, and '956 patents, are each and all of them valid and legal in every respect. The Court further finds that said patents and their respective claims are new and novel combinations; they were not anticipated by prior patents or publications, and there was no erroneous designation of inventors. The Court also finds that the disclosures and teachings in the claims are adequate; that the prior art relied upon by Admiral, whether cited or not cited by the Patent Office against Zenith's patents, is not such that the inventions of said patents would have been obvious to those skilled in the art.

63. Admiral pleaded that the Space Command patents in suit were unenforceable by Zenith by reason of alleged unclean hands in connection with the prosecution in the Patent Office of the '025 patent. The plea of unclean hands rested on the charge that Zenith's patent solicitors wrongfully filed and prosecuted the application which matured into the '025 patent without bringing to the attention of the Patent Office the prior art patent to Andrews, No. 2,739,273, the existence of which was known to Zenith's solicitors at the time they filed the '025 application.

64. The undisputed facts on which Admiral's charge of unclean hands must be judged are as follows:

The subject matter of the '025 patent was first presented to the Patent Office in April, 1956, as a part of the patent application which ultimately became the '954 patent. At that time Zenith's solicitors were not aware of the existence of the Andrews prior art patent. In early 1957, the Patent Office issued a ruling that the 1956 application included two distinct areas of invention and required that the application be divided into separate applications. In August, 1957, the divisional application which ultimate-

ly became the '025 patent was filed with claims drawn to the Adler remote-control receiver circuit. Sometime between June 19, 1956, and August 4, 1957, Zenith through its service department, learned of the Andrews remote-control system for opening garage doors, which was being manufactured and sold by the Vendo Company. Following this discovery, Zenith's patent department made a check of the Patent Office indexes to determine what patents had been issued to Vendo Company, and, in doing so, discovered the Andrews Patent No. 2,739,-273. When the divisional application that ultimately became the '025 patent was being prepared, Zenith's patent solicitors reviewed its claims and satisfied themselves, in their professional judgment, that all such claims distinguished the Adler invention patentably from the Andrews patent and all other prior art known to them. The claims of the divisional application included eight claims taken over bodily from the 1956 parent application and three new claims. All the claims specified a circuit having Dr. Adler's duty-cycle feature, which is not disclosed in the Andrews patent, or any other prior art of record. In addition, most of the claims in the divisional application distinguished from the Andrews patent in other respects as well, such as by reciting the Adler circuit in which a single discriminator is connected through two output connections to a pair of separate relay control circuits. The divisional application was filed, without any reference therein to the Andrews patent, and it was allowed by the Patent Office on the first official action. There is no evidence of record indicating that the Andrews patent was actually considered by the examiner who allowed the '025 patent.

65. Zenith's solicitors, in good faith, believed the '025 invention, as defined in the claims drafted to cover it, was patentable over the prior art, including the Andrews patent. Under those circumstances they were under no professional obligation or moral duty to cite the Andrews patent in the specification of the divisional application or otherwise to call it to the Patent Office's attention while the application was pending. In view of all of the facts of this case, the Court finds that Admiral has failed to show any improper conduct on the part of Zenith's patent solicitors. The unclean hands defense is, therefore, without basis and is rejected.

*Admiral's Copying Of Space Command*

66. When Zenith's Space Command television receivers appeared on the market, they promptly attracted favorable attention in the industry, and Admiral almost immediately undertook to design and produce a competing product. At the beginning, Admiral's engineers tried to develop a system of their own, using the broad concept of remote control by ultrasonic sound impulses but not necessarily copying directly the circuits and mechanical devices developed by Zenith for Space Command. Even so, Admiral's engineers had Zenith's Space Command transmitters and television receivers in their laboratories, and they used them as models and guideposts for their own work.

67. Admiral's engineering group assigned to design a manual transmitter worked along original lines for only a brief interval. After unsuccessful experimenting with tuning forks as a means of generating ultrasonic signals, and brief consideration of dog whistles for that purpose, Admiral's engineers decided to go straight down the pathway which Zenith had tracked out. They adopted cylindrical rods as ultrasonic generators, made of aluminum of the same size and type used by Zenith. They adopted the same band of frequencies Zenith had chosen. After trying out, without success, other schemes for mounting the resonator rods in the transmitter box, they adopted the same technique for resonator mounting that Zenith, after long research and study, had worked out for its use in the Space Command transmitters. Admiral also copied the sliding push-button actuator used in the Zenith transmitter, as well as the damper mechanism, invented by Dr. Adler, by which release of the push-button caused a metallic damper element

to bear against the side of the vibrating rod, thus damping out the ultrasonic vibrations after the proper time interval. In the mass production of its aluminum resonator rods, Zenith had developed a technique for adjusting their pitch by drilling small radial holes at the rod centers; defendant copied that too.

68. It is clear and convincing that Admiral's engineer initially assigned to work on the receiver aspect of defendant's remote-control system did for a while try to develop something original. Shortly before Christmas of 1956, however, Admiral's management demanded that a completed remote-control system be ready for production without delay, and Admiral's director of engineering ordered his staff to make a straight copy of Zenith's Space Command receiver. This order was carried out, even to the extent of copying the minute details of Zenith's receiver circuit. The story is best told by Admiral's own employees and former employees in the depositions offered in evidence in the case. Mr. De-Cola, Admiral's chief engineer at the time of the Admiral Son-R development, when asked about copying the Zenith product said: "There is no other way out of it." The testimony of another witness, Holpuch, was to the effect that DeCola as chief engineer advised him to go ahead and use the circuit described in Adler's '025 patent.

69. By thus copying both the transmitter and receiver aspects of Zenith's remote-control system, Admiral was able, by June 1957, to produce and market television receivers equipped with an ultrasonic remote-control called "Son-R". This system is a direct copy of Space Command. It was vigorously promoted by Admiral and is acknowledged by Admiral to have contributed impressively to its television sales in recent years.

70. During the period since the initial introduction of Admiral's Son-R system in mid-1957, Admiral has from time to time brought out new models. In some respects the new-model remote-control receivers have been less nearly identical to Space Command than were the original Son-R receivers, although the novel circuit features of Zenith's receivers have still been utilized and many specific circuit details of the Space Command receiver still copied. However, it was stipulated at the trial, and the Court finds, that defendant's current 1960 model receiver circuit does not infringe plaintiff's Patent No. 2,817,025.

71. The progressively introduced new models of Admiral's Son-R hand transmitters have, even more conspicuously than the receivers, been copied from Zenith's Space Command transmitters. In the revised version of Son-R being marketed at the time this action was commenced, the frequency range was still the same as Zenith's, the method of mounting the resonator rods was identical, and the push-button mechanism was Zenith's. In June of 1957, Zenith modified its Space Command transmitters by changing the finger controls from sliding push buttons to piano-key push buttons. Admiral promptly made the same change.

72. The evidence leaves no doubt that defendant's Son-R remote-control system originated in a deliberate and conscious decision by defendant to copy plaintiff's Space Command in order to compete with it without the delay that development of an original system would necessarily have entailed. The evidence is equally conclusive that this decision was fully carried out, the copying having been slavish to a remarkable degree. The similarity between the Space Command system and defendant's copy of it is so great that either party's television receiver can be remotely controlled by use of the other party's manual transmitter, a fact which was demonstrated in open court.

*The Commercial Success Of The Space Command Remote-Control System And The Public Recognition Accorded It*

73. The testimony is undisputed that Space Command for the first time in the history of the art gave the public a remote-control system which it could really use and depend on, and the public responded with enthusiastic acceptance as

will be noted from the testimony of both plaintiff and defendant as it relates to the increase in sales of not only television, but other products marketed by said companies.

74. Space Command was publicly introduced in June of 1956 and in that year represented 19.3% of Zenith's total unit sales of television receivers, despite the fact that the Space Command sets were, on the average, from sixty to eighty dollars per unit more expensive than comparable receivers without remote control. In 1957, 85,500 Space Command television receivers were sold by Zenith, for a total of $17,700,000 in sales, representing 18.3% of Zenith's dollar sales of television receivers. In 1958, the sale of Space Command units totalled 123,500, for a total of $26,300,000, being 22.5% of Zenith's total dollar sales of television receivers. By 1959, the sales of Space Command television receivers rose to over 260,000 units, dollar sales in 1959 being $50,700,000. This constituted 30.-27% of Zenith's total dollar sales of television receivers in that year. Thus, unlike earlier television remote-control systems, which at best enjoyed a brief flurry of popularity and then disappeared, Space Command promptly won consumer acceptance and has retained it, rising steadily in public favor and in sales, both in terms of dollars and percentage of total television business. While Space Command has admittedly been promoted vigorously by Zenith, the evidence shows that its great success is a tribute to the product itself, rather than to Zenith's promotional effort. For example, Zenith's advertising and promotional expenditures on Space Command in 1956 were substantially equal to its previous year's expenditures on advertising and promotion of the flashing-light remote-control system. The 1955 sales of television receivers having the flashing-light system amounted to only 4.5% of Zenith's unit sales of television receivers, however, whereas Space Command, with equal promotional effort behind it, achieved unit sales in 1956 totaling 19.3% of Zenith's television sales.

75. The commercial success of Admiral's Son-R has likewise been impressive. Admiral has advertised its Son-R remote-control system as being "new," "revolutionary," a "modern miracle". Son-R has repeatedly been publicly acknowledged by Admiral's officers to be the chief factor accounting for Admiral's increased sales of television receivers in the years since its introduction. Admiral's unit sales of Son-R receivers in 1958 were 5.8 times as great as in 1957, and in 1959, the Son-R unit sales were 29.5 times as great as the 1957 sales. Thus, Admiral's sales of remote-control television receivers increased nearly thirty-fold in the two years following introduction of Son-R.

76. In addition to enjoying remarkable success in the market place, Space Command has received impressive recognition from the television engineering profession. The professional group on broadcast and television receivers of the Institute of Radio Engineers, on April 10, 1959, conferred on plaintiff's Dr. Robert Adler its "Outstanding Technical Achievement Award" for his "outstanding original work in ultrasonic controls."

### The Infringement Of The Space Command Patents

77. Admiral's first Son-R remote-control receivers, designated the 8G1 and 8F1 models, were slavish copies of Zenith's receivers and, in consequence, embodied not only the basic circuit combination of the Adler '025 patent but also all of its optional features. The 8G1 and 8F1 amplifiers contain all the elements recited in each of the claims of the '025 patent, except claim 6, and Admiral's 8G1 and 8F1 remote-control receivers infringe each of those claims.

78. Admiral's later-model remote-control receiver, designated the 8R1, was essentially like the earlier 8F1 and 8G1 models, save for the fact that it did not employ the optional frequency-multiplication feature of the Adler '025 patent. The 8R1 amplifier does embody the basic circuit combination of the Adler '025 patent and additionally embodies the optional feature of the dual-frequency dis-

criminator with two separate output connections, fed to separate relay control tubes. The 8R1 amplifiers contain all the elements called for by each of the claims of the Adler '025 patent except claims 1, 2, 3, and 6, and they infringe each and all of those claims.

79. Admiral has made and sold other remote-control receiving units, respectively designated 6E3, 4G3, and 4H3, which are generally similar in circuit design to the 8R1 receivers, save for the fact that they are two-channel systems, rather than four-channel. Each of the 6E3, 4G3, and 4H3 remote-control receiver types embodies the basic circuit combination of the Adler '025 patent and also embodies one dual-frequency, double-output discriminator circuit. Hence, each of the 6E3, 4G3 and 4H3 amplifiers contains all the elements recited in each of claims 4, 7, 8, 9, 10, and 11 of the Adler '025 patent and infringes each of those claims.

80. Zenith's proof of infringement, on which the foregoing findings were based, was clear and convincing, and Admiral offered no evidence contradictory thereto.

81. The invention of the '956 patent consists of an elongated longitudinal resonator having a plurality of spaced transverse grooves on opposite sides of the vibrator in the nodal plane, a supporting bracket, and "spring wire support means" for resiliently holding the vibrator on the mounting bracket, the spring wire support means comprising portions retained within the grooves and being bowed to contact the vibrator "at a limited number only of discrete points spaced about the periphery of said vibrator."

82. All of the Son-R transmitters made and sold by Admiral prior to commencement of this action embodied the preferred form of the invention of the '956 patent. That is, the rod mountings used in such Son-R transmitters employed a pair of oppositely disposed flat-bottomed grooves in the nodal plane of the rod, in combination with a mounting bracket and a spring wire support means, retained within the grooves and bowed so as to contact the rod only at the end points of the respective grooves. Thus, such Son-R transmitters completely utilized the teachings of the '956 patent in its preferred embodiment and conformed completely to the definition of the invention as set forth in the claims. All the claims of the '956 patent are infringed by all of the Son-R transmitters manufactured and sold by Admiral prior to commencement of the action.

83. Zenith's evidence as to the construction and operation of Admiral's Son-R transmitters, on which the foregoing finding is based, was clear and convincing, establishing that Admiral's rod mounting is in all material respects identical to the preferred construction taught in the '956 patent, working in the same manner and achieving identically the same result. Admiral offered no evidence in opposition to Zenith's proofs in this regard, except to point out that the "spring wire support means" in Admiral's transmitters was made of two separate pieces of wire anchored at their respective ends to the mounting bracket, whereas the corresponding "spring wire support means" shown in the Wold patent consisted of a single piece of wire bent double, somewhat like a safety pin, to provide upper and lower bowed spring portions. This distinction is wholly without significance. In both Zenith's and Admiral's transmitters, the effective parts of the spring-wire support means are those spring-wire elements which extend across the mounting bracket, anchored to the bracket on opposite sides and gripping the resonator rod between them. The use of a single bent wire as opposed to a pair of separate wires has no effect whatever on the operation of the device or the results obtained therefrom. The claim language calling for "spring wire support means" is equally descriptive of either construction and there is no estoppel, arising from the prosecution of the application in the Patent Office, against assigning to this language its broad and generic meaning.

84. In 1960, a short time before the trial of this action, Admiral commenced making and selling Son-R transmitters in which the rod mounting is slightly different from that used in the earlier Son-R models, in that each resonator rod is provided with a circumferential groove extending entirely around it at the nodal plane. The bowed spring wires hence contact the rod at only two spaced discrete points, as opposed to the four points of contact employed in the preferred form of the invention. Admiral has placed in evidence a specimen of this new-type rod mounting and has urged that it does not infringe the '956 patent. This contention is rejected. The circumferential groove extending entirely around the resonator rod is the full functional equivalent of the pair of oppositely spaced nodal-plane grooves as called for by the '956 claims, since, as Admiral's experts admit, the side portions of the circumferential groove perform no function in the rod mounting and represent mere surplusage. The '956 patent claims call for spring-wire supports "bowed to contact said vibrator at a limited number only of discrete points spaced about the periphery of said vibrator". The two-point suspension of Admiral's 1960 rod mounting conforms fully to this requirement. Zenith was familiar with the two-point suspension before the '956 patent application was filed, and it is clear from the claim language that this form of the Wold invention was intended to be embraced within the claims. The two-point suspension is not as effective in holding the vibrator tightly against lateral movement as the preferred three and four-point forms of suspension, but it is equally effective in supporting the rod without reducing its "Q". Admiral's 1960-model transmitters represent an imperfect utilization of the '956 invention, apparently adopted by Admiral in the hope of evading infringement of the patent while enjoying the major benefits of its teachings. Those transmitters do infringe all of the claims of the '956 patent.

85. The '955 patent shows two forms of the invention. The form shown in Fig. 1 of the drawing utilizes a sliding-type of push button; the other, shown in Figs. 2–4 of the drawing, employs a piano-key type of push button. The operating principles of both forms of the invention are essentially the same, and they produce the same result.

86. Zenith's original Space Command transmitter was of the type using a sliding push button, and Admiral's first Son-R transmitter was similarly constructed. In June of 1957, Zenith brought out a new model of Space Command transmitter using the piano-key construction, and Admiral promptly followed suit. The early, sliding-button transmitters made and sold by Admiral infringe claims 1–8, 12, and 13 of the '955 patent, and the later, piano-key transmitters made and sold by Admiral infringe claims 1, 2, and 9 of the '955 patent. The Son-R transmitters of this latter type also include the 1960-type Son-R transmitters of which a specimen was placed in evidence by defendant. Zenith's evidence showing infringement of the '955 patent as aforesaid was clear and convincing, and Admiral offered no evidence in opposition thereto. Hence there is no fact issue in the case relative to infringement of the '955 patent.

87. The '954 patent is directed to the damping feature of the Space Command transmitter which assures control of the duration of the ultrasonic command signals. Structurally, the damper element is arranged to contact the side of the longitudinal-mode vibrator and to move sequentially in response to actuation of the push button. As the push button is depressed, the damper is displaced from its rest position in which it contacts the side of the vibrator rod to another position in which it is totally free of contact with the rod. As the push button is released, the damper returns to its rest position, contacting the side of the rod and damping its vibration.

88. The Son-R transmitters first marketed by Admiral utilized the invention of the '954 patent, with a spring wire used as the damping element, and those transmitters infringe all claims of

the '954 patent. The later-model Son-R transmitters of the type using piano-key push buttons did not employ any damping means and do not infringe the '954 patent. The 1960-model Admiral transmitters, of which a specimen was placed in evidence by Admiral, use end damping by means of a soft damper element and also do not infringe the '954 patent. Zenith's proof with respect to infringement of the '954 patent by the original Son-R transmitters was clear and convincing, and Admiral offered no evidence in opposition thereto. Hence there is no fact issue in the case with respect to infringement of the '954 patent.

### The Fringelock Patents And The Inventions To Which They Relate

89. The '671 and '583 patents in suit relate, respectively, to a basic television circuit, commonly called by the trade name "Fringelock", and to a later improvement or modification of that circuit. The main function of Fringelock is to separate the synchronizing pulses from the remainder of the television signal while suppressing strong noise pulses which might otherwise interfere with picture synchronization.

90. The basic Fringelock circuit utilizes a vacuum tube having two control grids which act as "gates", sometimes blocking and sometimes permitting passage of electric current through the tube. One of these two control grids, called the "separator grid", is normally "biased" or charged to a negative electric voltage sufficiently great to prevent passage of current through the tube. Thus, this grid may be thought of as a normally "closed gate". The separator grid is fed by a television signal, called a "composite video signal", which contains the synchronizing pulses spaced at intervals with picture signals in between. The picture signals do not have sufficient voltage to open the "gate", and, consequently, these signals do not appear in the output current of the tube. When a synchronizing pulse appears on the grid, however, it produces a sufficiently large voltage to overcome the negative voltage on the separator grid and thus momen-

tarily opens the "gate". This results in a flow of current through the tube. Since the synchronizing pulses open the "gate" and the picture signals do not, the output signal of the tube consists only of synchronizing signals without any picture signals. Noise pulses, such as may be caused by static or electric machinery, produce voltage pulses on the separator grid that may be much stronger than the synchronizing pulses, and such pulses will also open the "gate". In the Fringelock circuit, such noise pulses are prevented from getting into the output circuit by the action of another control grid called the "noise-gate". This noise-gate grid is provided with a positive "bias" voltage which operates to keep the gate normally open. The composite video signal is applied to this noise-gate grid, but in polarity opposite to that of the signal fed to the separator grid. The bias voltage on the noise-gate grid is so adjusted that the gate will remain open at all times when only the normal television signal is coming in. A strong noise pulse, however, will have sufficient voltage to close the noise gate and thereby prevent the flow of current through the tube. As a result, noise pulses are eliminated from the output current of the tube. Also, in the preferred form of the Fringelock invention used by both the plaintiff and defendant, the closing of the noise gate prevents the noise pulses from charging up the coupling condenser in the separator grid circuit, and thus prevents "blocking" of the synchronizing circuits due to noise.

91. The basic Fringelock circuit, described in the foregoing finding, is covered by the '671 patent and was developed in 1951 by plaintiff's Dr. Adler in collaboration with Meyer Marks, who was at that time an employee of plaintiff. A patent application on the circuit was filed almost as soon as the circuit was perfected, but the '671 patent did not issue until November, 1957. The Fringelock circuit, itself, however, was incorporated in plaintiff's television receivers in the latter part of 1951 or early 1952, and it met with immediate success.

92. The mission of the so-called Fringelock circuit is to enable a television receiver to present a clear, steady picture notwithstanding interference of the type referred to by engineers as electrical noise which includes ordinary atmospheric static and also radio-wave impulses produced by electrical machinery such as electric shavers, vacuum cleaners, and the ignition systems of automobile engines. Fringelock minimizes the bad effect of such noises on picture reception and in a new and ingenious fashion provides almost complete immunity from these bad effects of electrical noise, substantially eliminating picture slipping, wallpaper effects, and blocking.

93. While results similar to those of Fringelock can be obtained by other circuits more complicated and more expensive, some of which were known even before the invention of Fringelock, these other circuits are for the most part inferior to Fringelock in performance and in all cases are so much more expensive that they have been almost wholly superseded by Fringelock in modern television receivers. Since its introduction in the art, Fringelock has been used not only by Zenith and Admiral but by practically all other television manufacturers. Fringelock is an outstanding contribution to the television art.

94. In 1956, after the original Fringelock circuit had been in commercial use for several years, plaintiff's Dr. Adler, in collaboration with one John G. Spracklen, developed a modified and improved form of Fringelock circuit, in which the benefits of the basic circuit, from the viewpoint of noise suppression, were extended to include the automatic gain control function of the television receiver. This circuit is covered by the '583 patent. Promptly after this improved and modified Fringelock circuit appeared in plaintiff's television receivers, it was widely adopted by other manufacturers, just as the original Fringelock circuit had been several years before.

95. There is no fact issue in the case relative to infringement of the '671 and '583 patents, defendant having conceded that its products infringe these patents, if they are valid.

### The Defenses Asserted Against The Fringelock Patents

96. In attempting to show invalidity of the '671 patent for want of invention, defendant relies on a group of prior-art patents granted to one Haffcke, particularly the Haffcke patent No. 2,058,686. Some reference was also made by defendant to Selby patent No. 2,166,694, and Lamb patent No. 2,101,549.

97. Haffcke worked extensively in the 1930's on development of circuits for reducing the effects of noise in radio and television reception. Interestingly, Haffcke's closest approach to the Fringelock circuit was in his early patent, No. 2,058,-636, issued in 1936. His subsequent work carried him further away from the Fringelock circuit rather than closer to it.

98. The Haffcke '636 patent disclosed a circuit intended primarily for use in connection with a radio-frequency signal, as opposed to the composite video signal with which the Fringelock invention is concerned. An essential characteristic of this circuit was the use of one or more transformers in its input channel, which could be used successfully with radio-frequency signals but which could not handle a composite video signal of the kind used in present-day television. In a demonstration made to the Court by defendant, a model of the '686 Haffcke circuit, using transformers of recent design, succeeded in suppressing noise pulses from an artificially generated signal somewhat like a modern composite video signal but lacking the so-called "vertical synchronizing pulses" which are a necessary part of an actual composite video signal. This Haffcke model, even with transformers of recent design, was admittedly unable to work successfully with an actual composite video signal of the character which the Fringelock circuit handles as a matter of course. Admiral's expert witness, who demonstrated the Haffcke model, testified that he believed transformers might be procured today that would make the Haffcke circuit usable with an actual composite

video signal, but he agreed that such transformers alone would cost considerably more than the combined cost of all the components used in the Fringelock circuit.

99. The Haffcke circuit and the Fringelock circuit have one characteristic in common, namely the use of a tube connected in such a way as to have a so-called "aperture characteristic". In other respects, however, the Haffcke and the Fringelock circuits are radically different. One important difference has already been noted—the Haffcke circuit requires the use of one or more expensive input transformers, whereas no transformer is used in the Fringelock circuit. The bias voltages applied to the noise-gate grid and the separator grid in the Fringelock circuit are very different, the first being a positive bias voltage which holds the "gate" normally open and the other being a negative voltage which keeps the "gate" normally closed. In Haffcke, both grids have identically the same bias. The Fringelock circuit uses a tube having a screen grid which renders the operation of the noise-gate grid essentially independent of the operation of the separator grid. Haffcke uses no such tube; the two grids of the Haffcke circuit are coordinate and inter-dependent in their action. In Fringelock the signal is fed to the separator grid through a condenser; in the Haffcke '686 circuit no such condenser is used. That the two circuits are radically different is shown by the fact that the Haffcke '686 circuit has only two of the seven elements which comprise the combination defined in a typical claim of the '671 Fringelock patent.

100. The other prior-art patents relied on by Admiral against the '671 patent are even more remote from the Fringelock circuit than the '686 Haffcke patent. None of them will respond to any of the claims of the '671 patent and they do not teach the invention of the '671 patent. Under all the evidence in this case and viewed in the light of the Haffcke patents and the other prior art, the Fringelock circuit is a distinctly novel and different circuit which works in a distinctly novel and different way, achieving noise suppression more efficiently and economically than any previous circuit.

101. The expert witnesses for both parties agreed that, to the best of their knowledge, the Haffcke '686 circuit has never been used in any commercial radio or television receiver. The only Haffcke circuit that appears to have been used in any sort of commercial equipment was a circuit from another Haffcke patent, which appears to have been used in a Navy radio receiver. There is no evidence that any of the Haffcke circuits have ever been used in television receivers.

102. The Haffcke patents issued at various times during the 1930's and the other prior-art patents relied on by Admiral against the '671 patent also issued prior to 1940. During the period between 1936, when the '686 Haffcke patent issued, and 1951, when the Fringelock invention was made, many skilled workers were devoting their efforts to developing synchronizing-signal separator circuits that would successfully suppress noise pulses. In all that period, however, none of those skilled workers discovered the Fringelock circuit despite the presence in the art of Haffcke teachings and those of Selby and Lamb. When Fringelock was introduced by Zenith it was immediately recognized by the television industry as an impressive forward step in the art and was promptly adopted by virtually the whole television industry, almost to the exclusion of other synchronizing-signal separator circuits. Thus, it stands established that the Fringelock circuit fulfilled a long-felt want which other skilled workers had tried unsuccessfully for many years to satisfy. In view of this, it is clear that the Fringelock circuit of the '671 patent was not obvious at the time it was invented to persons of ordinary skill in the television art. It is, therefore, a patentable invention.

103. In attempting to show invalidity of the '583 patent in suit for want of in-

vention, Admiral relied on the original Fringelock circuit as disclosed in the '671 patent in suit, and on a certain television receiver circuit used by Philco about 1953. It was Admiral's contention, first, that the '583 circuit merely represented duplication of the original Fringelock circuit of the '671 patent and, second, that the basic concept of utilizing the Fringelock noise-suppression circuit for developing automatic gain control voltage was an old idea, as shown by the Philco receiver. These contentions must be rejected. The '583 circuit is not a mere duplication of the '671 Fringelock circuit, but, on the contrary, represents a new combination of circuit elements by means of which noise immunity is secured for both the synchronizing-signal separator circuit of a television receiver and also the automatic gain control circuit of such receiver. The '583 circuit achieves a new result not found in the prior art. While the Philco circuit does provide an automatic gain control voltage which is not affected by noise pulses, such voltage in the Philco circuit is affected by changes in the picture brightness, a condition which is highly undesirable. By contrast, the circuit of the '583 patent provides an automatic gain control voltage which is unaffected by noise pulses and which is also unaffected by changes in picture brightness. In view of its achievement of a new and useful result in a way not suggested by any prior art, it is plain that the invention of the '583 patent is not of such a nature as to have been obvious to persons of ordinary skill at the time it was made. It is, therefore, a patentable invention.

[2] 104. In addition to pleading that the Fringelock patents '671 and '583 are invalid for lack of invention, Admiral has asserted estoppel defenses. With respect to the '671 patent, Admiral asserts estoppel based on the fact that the Fringelock circuit was promptly and extensively adopted by the television industry following its appearance in Zenith's television receivers about the beginning of 1952. Zenith admits that by 1953 not only defendant Admiral but substantially all of the other television manufacturers were using the Fringelock circuit. The '671 patent, while applied for in 1951, was not granted until November 26, 1957. Zenith diligently prosecuted the application which matured into the '671 patent in that it responded to all Patent Office actions thereon within the time period allowed by law and Admiral does not dispute this. Promptly after issuance of the '671 patent gave Zenith the legal right to exclusive use of the Fringelock circuit, Zenith moved diligently to enforce its rights by bringing suit against Admiral for infringement.

105. During the pendency of the application which matured into the '671 patent, Admiral wrote to Zenith asking for the identifying numbers of any patents owned or controlled by Zenith which pertained to the improved or modified Fringelock circuit and on May 22, 1956 Mr. John J. Pederson, Assistant Manager of the Patent Department of Zenith, replied advising Admiral as follows:

"We have a number of pending patent applications of varying scope which are pertinent with respect to the circuit in question. As these patents issue, I will be very happy to call them to your attention."

106. More than a year later, on December 17, 1957 and after the issuance of the '671 patent, Pederson of Zenith again wrote to Admiral advising as follows:

"In my letter of May 22, 1956, I advised you that we had a number of pending patent applications of varying scope which were pertinent with respect to the circuit in question, and I indicated that I would call these patents to your attention as they issued. In accordance with my letter of May 22, 1956, please be advised that two of these applications have now issued as patents No. 2,814,671 and No. 2,814,801 which issued on November 26, 1957."

107. Zenith's conduct with respect to the '671 patent is subject to criticism in that its letter to Admiral in May of 1956 had not advised that the use of the circuit in question would infringe the patent if it subsequently issued. Again, in

its later letter to Admiral in December of 1957, Zenith was evasive in making no mention of all of the years of past use by Admiral of the circuit of the invention and in giving no warning or statement calling Admiral's attention to its claims of infringement and demanding that Admiral cease and desist in the use of this circuit.

108. The '671 patent issued November 26, 1957 and Zenith commenced its original action for infringement in early 1958. No unusual length of time elapsed under all of the facts and circumstances in this case between the issuance of the patent and the commencement of the action for infringement. Admiral had what Zenith refers to as a free ride in respect to Fringelock for nearly five years. Under the facts and circumstances of this case it should not be allowed to continue the free ride now that the application has ripened into a patent. It is found as a fact that under all the evidence in this case the doctrine of equitable estoppel by laches does not apply to the '671 patent and the defense of equitable estoppel is not applicable.

■ 109. The estoppel defense asserted with respect to the '583 patent is based on the fact that General Electric Company and other tube manufacturers have since 1956 sold the so-called 6BU8 tubes, the principal use of which is in the modified Fringelock circuit of the '583 patent, and gave their customers information concerning the circuit. Zenith has no patent on the 6BU8 tube as such, and has at no time had legal right to restrain the sale of such tubes. Moreover, until such time as it obtained the basic '671 patent, Zenith had no legal right to restrain the use of the BU8 circuit by other television manufacturers and had no right to restrain the circulation of information concerning such circuit. The evidence discloses that General Electric did in its literature regarding the BU8 tube advise prospective customers to check with Zenith as to the patent status of the circuit. Through its correspondence with Zenith in 1956, Admiral had actual notice, prior to its commercial

adoption of the '583 circuit, that Zenith claimed ownership thereof and had patent applications pending on it. It is undisputed that Admiral in effect copied the BU8 modified Fringelock circuit. It does not dispute its infringement of the '583 patent. While Admiral's argument of equitable estoppel as herein expressed is somewhat ingenious, it is not valid as a defense to the '583 patent. We find as a fact that both the '671 patent and the '583 patent are valid and have been infringed by the defendant.

### The Phonograph Phase Of The Case

■ 110. Zenith has conceded that Admiral's Faulkner patent No. 2,498,333 is valid and that it has, within the statutory limitations period, sold record changers having spindles made in accordance with the invention of that patent. The only questions for determination with respect to Admiral's counterclaim, therefore, are whether the Faulkner-type spindles sold by Zenith were licensed by Admiral and whether Admiral is estopped by its own conduct from asserting the Faulkner patent against Zenith.

111. The substance of the evidence in respect to the Zenith defense is that when the Faulkner patent issued on February 21, 1950, the V–M Corporation had already been openly manufacturing and selling record changers having spindles almost identical to the Faulkner patent; that the V–M Corporation continued to manufacture and sell these spindles after the Faulkner patent issued. In March, 1951, Admiral and the V–M Corporation carried on numerous negotiations in respect to V–M's infringement of the Faulkner patent. Admiral's attorney J. D. Douglass called on Earl M. Rush who was V–M's Secretary and General Manager. Douglass' charge that V–M was infringing the Faulkner patent was met by rejoinder from Rush that Admiral was infringing a patent owned by V–M and known as the Miller patent, which covers another part of the mechanism both companies were using. V–M was willing to give Admiral a free license under the Miller patent for use

in Admiral's own record changer only, in exchange for an unrestricted license to Admiral's Faulkner patent. V–M was not willing, however, to give a free license under the Miller patent to sell record changers to the industry generally. No agreement seems to have been reached. Sometime subsequent thereto further negotiations and correspondence between Admiral and V–M ensued but no written license agreement was ever entered into. The documentary as well as the oral testimony in the case shows that the parties did arrive at an informal understanding which was in legal effect a free cross-license.

112. Prior to 1957, Zenith was making record changers only for its own use. At that time, Zenith concluded extensive marketing surveys and cost analysis studies concerning the feasibility of continuing to remain in the record-changer business. Zenith's decision was that the most prudent business policy would be to discontinue the manufacture of phonograph-record changers, and remain in the field by purchasing changers exclusively from an outside source. Their study showed that the changer best able to meet Zenith's specific requirements was that made by V–M, and employing the spindle covered by the '333 patent. Thereafter, V–M advised Zenith that V–M had rights under the '333 patent. Based upon this representation, and the knowledge by Zenith of the industry's extensive use of spindles embodying the teachings of the '333 patent, Zenith began purchasing changers from V–M.

113. The evidence shows that Zenith certainly could have been more diligent in its investigation concerning the existence of any licenses between V–M and Admiral, that is, Zenith could have inquired of Admiral as to Admiral's understanding of the relationship between it and V–M. However, Admiral's subsequent conduct confirms Zenith's contention that there was a license arrangement existing between Admiral and V–M respecting the '333 and Miller patents. Admiral admits that it never at any time between April, 1951 and the present time sued the V–M Corporation or any of its customers other than Zenith for infringement of the Faulkner patent; it admits that it has not given notice of infringement under the Faulkner patent to V–M Corporation, or any of its customers except Zenith. Moreover, Admiral acknowledges that the V–M Corporation has never sued, nor given any notice of infringement to Admiral, or any of its customers since the termination of discussion between Admiral and V–M in 1951 in respect to V–M's so-called Miller patent.

## Conclusions of Law

1. This Court has jurisdiction of the parties and the action, and the venue is properly laid in this District.

2. Plaintiff Zenith Radio Corporation is the owner of United States Letters Patent Nos. 2,817,025, 2,821,954, 2,821,955, and 2,821,956, relating to various structural and circuit features of the Space Command remote-control system, and United States Letters Patent Nos. 2,814,671 and 2,915,583, relating respectively to the original Fringelock circuit and the later modified and improved form thereof.

3. Each of said United States Letters Patent Nos. 2,817,025, 2,821,954, 2,821,955, 2,821,956, 2,814,671, and 2,915,583 is good and valid in law, and the claims thereof as specified in the foregoing findings, have been infringed by defendant within the six years next preceding the filing of this action.

4. Plaintiff is in no wise estopped or barred, by law or equity, from enforcing such Letters Patent, and each of them, against defendant.

5. Defendant's infringement of Letters Patent Nos. 2,817,025, 2,821,954, 2,821,955, and 2,821,956 resulted from intentional conscious copying by defendant of plaintiff's Space Command remote-control system.

6. Proceedings directed to accounting and determination of the damages due to plaintiff shall be reserved for further order of the Court, pending completion of appellate proceedings in this action or until the time for commencement of such proceedings shall have passed. Deter-

mination of whether plaintiff shall recover treble damages or its attorneys' fees, or both, is similarly reserved for further order of the Court.

7. Plaintiff is entitled to a permanent injunction restraining defendant, its agents, servants, distributors, officers, and employees, and all other persons in privity with defendant, from further infringement of each and all of said United States Letters Patent Nos. 2,817,025, 2,821,954, 2,821,955, 2,821,956, 2,814,671, and 2,915,583.

8. Defendant is the owner of United States Letters Patent No. 2,498,-333, and such Letters Patent is good and valid in law.

9. Defendant's counterclaim for infringement of said Letters Patent No. 2,498,333 is lacking in equity. Plaintiff has, within the six years next preceding the filing of said counterclaim, used and sold apparatus embodying the invention of said Letters Patent, but such use and sale did not constitute infringement of said Letters Patent, all such apparatus having been purchased by plaintiff from one licensed by defendant to make and sell it. Said counterclaim must therefore be dismissed.